

# THE ATTORNEY GENERAL
## OF TEXAS
### AUSTIN, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

April 13, 1948

Hon. Lloyd King                    Opinion No. V-544.
District Attorney
47th Judicial District     Re:  The legality of the
Amarillo, Texas                 contest type theater
                                attendance stimulator
                                plan known as "Bank
                                of Knowledge".

Dear Sir:

Your letter of January 12 encloses data descriptive of a plan to distribute prizes by question and answer contests. The plan is denominated "Bank of Knowledge". The general scheme of the plan is outlined and sample questions and answers used in a motion picture theater at Childress, Texas, are enclosed. You state:

"The operation of the plan is self-evident from the attached instruments and exhibits, and appears to be a question and answer program similar to the Dr. I.Q. program except that the entire audience participates and there is only one award given rather than several awards. There is no selection by chance or by lot or by any type of device as to who may participate in answering the five questions. Anyone in the theater may win the award."

Your particular question is:

"Does the operation of the Bank of Knowledge constitute a lottery under the laws of the State of Texas?"

The plan purports to operate essentially as follows:

A substantial cash prize is posted by the theater and all in attendance at the theater may participate in the contest to win the prize. If no prize winner is selected, the prize for the subsequent contest is increased. Regional and national contests are contemplated

but a description of them is not contained in your letter or the data submitted. At the local contest, up to five questions are asked from the stage. Following each question, a number of answers are read from the stage and each answer is given a letter designation. The contestants hold a card upon which appears a number of letters corresponding to the various answers to each question. Each contestant is to punch the letter which he believes corresponds to the correct answer to each question. After the contestants have punched answers to all five questions, the correct answer to the first question is announced, and those answering the first question correctly are to stand the remainder to remain seated. The answer to the second question is then announced and those missing it are to be seated. This process is continued until all are seated after the announcement of the answer of the fifth question or if one remains standing he wins. If more than one is standing, some additional questions are asked and the process of elimination continues until a winner is chosen. If, however, no one answers the first five questions correctly, no winner for that contest is chosen. It is only in the event that more than one complete the first five questions correctly that the process of elimination is continued until a single winner is chosen.

The first five questions used in the performance referred to are as follows:

QUESTION NUMBER ONE: Designate the President of the United States that organized the "Rough Riders". Was it: (A, Stonewall Jackson) - (B, John Quincy Adams) - (C, Theodore Roosevelt) - (D, William Howard Taft) - (E, Woodrow Wilson) - (F, Ulysses S. Grant)?

QUESTION NUMBER TWO: In what year did Babe Ruth hit sixty home runs? Was it: (A, 1921) - (B, 1923) - (C, 1925) - (D, 1927) - (E, 1929) or (F, 1931)?

QUESTION NUMBER THREE: A method of what is called the bertillon system? Is it: (A, shorthand) - (B, criminal identification) - (C, transportation ) - (D, blind reading) - (E, horse racing ) or (F, yachting)?

QUESTION NUMBER FOUR: About how many persons had crossed the ocean by air before Lindberg made his solo flight? Was it: (A, none) - (B, 4) - (C, 24) - (D, 42) - (E, 64) or (F, 104)?

QUESTION NUMBER FIVE: The letter R with a line drawn through the tail at the top of a doctor's prescription blank means: (A, prepare) - (B, mix well) - (C, attention) - (D, I prescribe) - (E, keep cool) or (F, recipe)?

Questions for elimination in the event of a tie, that is, in the event more than one person answers all five of the foregoing questions correctly, are:

| | | |
|---|---|---|
| Who was Old Hickory? | Answer - | Jackson. |
| Who invented the steam boat? | " | Fulton. |
| What is swiss chard: | " | A vegetable. |

Article 654, of the Penal Code, prohibits the establishment of a lottery. The statute contains no definition of a lottery but in this connection 28 Tex. Juris. 409, 410 contains the following statement:

"The term lottery has no technical signification in the law, and since our statute does not provide a definition, its meaning must be determined from popular usage. According to that test, a lottery is a scheme for the distribution of prizes by lot or chance among those who have paid or agreed to pay a consideration for the right to participate therein, or the distribution itself."

In order to constitute a lottery, it is generally considered that three elements must be present. They are: (1) consideration; (2) prize; and (3) chance. 34 Am. Jur. 647, 648. The main question involved here is whether or not the element of chance exists in such a degree as to make the plan illegal, it being conceded that consideration and prize are present.

Two former opinions of this office are pertinent to your inquiry, both of which are attached hereto for reference. Opinion No. V-238 involved a plan known as "bonanza". It was there considered that if the element of chance predominated over the element of skill, the other elements being present, the scheme was a lottery. "Bonanza" involved the distribution of tickets on the back of each of which was printed a question. Each ticket was numbered. A drawing was conducted and those holding lucky numbers were offered an opportunity to answer the question on the back of their ticket. If the question was answered correctly, the lucky person

Hon. Lloyd King, Page 4, V-544.

might then answer one or more of ten additional ques-
tions, and for each correct answer a prize was given.
It was there held that chance predominated over skill
and the plan was held to be illegal.

In Opinion No. 0-1789, this department passed
upon the legality of a theater program known as "Dr.
I. Q.". The "Dr. I. Q." program was conducted by select-
ing from the audience a number of persons, each of whom
was asked a series of questions similar to those above
set out, and prizes were offered to each person indivi-
dually dependent upon his correct answers to such ques-
tions. In the "Dr. I. Q." program, there was no contest
between the various members of the audience. There was
nothing to indicate that participants were selected by
a drawing. On the authority of Boatwright v. State,118
Tex. Cr. R. 381, 38 S. W. (2d) 87, hereafter discussed;
McRae v. State, 46 Tex. Cr. R. 489, 81 S. W. 741; and
Hoff v. Daily Graphic, 230 N.Y.S. 360, 103 A.L.R. 870,
dealing with the question of skill v. chance, it was
determined that the "Dr. I. Q." program did not violate
the lottery laws of this State.

In Boatwright v. State, supra, the Appellant
was convicted of operating a lottery. He had exhibited
a punchboard from which might be punched a checker prob-
lem, the solution of which would require skill in check-
er playing. The exhibitor held the key to the better
solutions and customers were allowed to take the problems
home and work them out, presenting his solution to the
exhibitor of the board who, if the solution was the best,
awarded a prize. The exhibitor might require under that
scheme not only the best solution, but the quickest and
the neatest. The Court in that case said:

"It is observed that the success of
the player in the game under consideration
depends upon practice, experience or skill.
Other than the ordinary chance or contin-
gency which is involved in practically every
human endeavor, the element of chance is
not present. The prize is drawn as a re-
ward for the skill of the player, and not
by chance. The predominant element in the
game is one of skill. There is no more re-
semblance to a lottery in the game than
there is in the operation of the knife rack
described in McRae v. State, 46 Tex. Cr. R.
489, 81 S. W. 741. In that case, in holding

the game not within the inhibition of the stat-
ute denouncing lotteries, Judge Davidson said:

"'The evidence discloses that it was an
ordinary knife rack, which consisted of a slop-
ing board and arranged so that rings could be
thrown and lodged upon the knives, and when the
player was fortunate enough to throw one of
these rings around a knife, or catch it on a
knife, the knife became his property. . . A
lottery is commonly understood as a "scheme for
the distribution of prizes by lot or chance, es-
pecially a gaming scheme in which one or more
tickets bearing particular numbers draw prizes
and the rest of the tickets are blank." There
were no tickets distributed under the scheme,
as shown in the testimony but rings were sold,
and the thrower of the rings took chances as to
whether he could inclose one of the knives by
one of the rings so thrown, and the success of
the pitcher depended upon his practice, exper-
ience, or skill. We do not believe it was a
lottery.'"

The Court then cites a number of cases which
had passed upon the identical checker game punchboard.
The Court then quotes from Johnson  v. McDonald, 132 Ore.
622, 287 Pac. 220, 221, as follows:

"It will be seen from the directions that
the prize is drawn, not by chance, but as a re-
ward for the skill of the person claiming the
prize. If there is any element of chance at
all about the device, it is in the drawing of
the problem. Any problem drawn requires the
solution of the game of checkers presented by
that particular problem. From the directions
given with the Advertoshare problem checker-
boards we learn that the problem is the comple-
tion of a game of checkers that has been part-
ially played. The device was invented by a fa-
mous checker player. So far as it is humanly
possible, the several problems are of equal dif-
ficulty. No distribution of prizes is made by
chance or lot. Gambling does not have any place
in the game as it is intended to be played. <u>The
prizes offered are trivial, and do not offer any
inducement for one to purchase an opportunity to
play the game.</u>

> "There is no more resemblance to a lot-
> tery in the scheme than there is in a game
> of billiards or of cards where such games
> are played in a public place and charges are
> made for the privilege of using the billiard
> tables or card tables. The predominant ele-
> ment in the game is one of skill. The game
> would not appeal to any one who did not like
> to play checkers. There is no apparent like-
> lihood at all that the game, if played as
> designed, would cultivate a spirit of gambl-
> ing." (Emphasis supplied)

The conviction was reversed because the game was held
to be one of skill and not of chance.

In Hoff v. Daily Graphic, 230 N.Y.S. 360, ref-
ferred to above, the contest involved the selection of
play titles, appropriate to drawings published in the news
papers and it was held that though the solution involved
chance to some extent, it was predominately a contest of
judgment and taste.

In Rouse v. Sisson, 199 So. 777, 132 A. L. R.
998, by the Supreme Court of Mississippi in 1941, the
Court considered a mechanical device which flashed a ques-
tion upon a screen upon the deposit of a nickel into the
machine. The machine then exhibited a number of alter-
nate questions and the player was given a number of sec-
onds in which to punch a key corresponding to what he
thought was the correct answer. A prize was awarded if
he punched the correct key. Such a machine was held to
be a game of skill rather than chance and was held to be
legal.

Attempts to exhaustively examine the nature of
"chance" as contemplated by the laws of this country sup-
ressing lotteries could easily lead us into an obscure
discussion throwing more shadow than light upon the prob-
lem. The better approach is to look at the scheme as a
whole, its purpose and the natural tendencies of those who
conduct it and participate therein.

We quote from 34 Am. Juris., page 650:

> "It has been said that no sooner is the
> term 'lottery' defined by a court, than ingen-
> uity evolves some scheme within the mischief
> discussed, although not quite within the let-
> ter of the definition given; but an examina-
> tion of the many cases on the subject will show

that it is very difficult, if not impossible, for the most ingenious and subtle mind to devise any scheme or plan, short of a gratuitous distribution of property, which has not been held by the courts of this country to be in violation of the lottery laws in force in the various states of the Union. The court will inquire, not into the name, but into the game, however skilfully disguised, in order to ascertain if it is prohibited, <u>or if it has the element of chance."</u> (Emphasis supplied)

From 34 Am. Juris., page 647, we quote:

"Where the term 'lottery' is not defined by statute directed against it, it has been stated that a definition which includes as an element <u>the evil which the statute was intended to prevent must be adopted."</u> (Emphasis supplied)

From the leading case of State v. Globe-Democrat Publishing Company, 341 Mo. 862, 110 S. W. (2d) 705, 113 A.L.R. 1104, we quote:

"It is impossible to harmonize all the cases. But we draw the conclusion from them that where a contest is multiple or serial, and requires the solution of a number of problems to win the prize, the fact that skill alone will bring contestants to a correct solution of a greater part of the problems does not make the contest any the less a lottery if chance enters into the solution of another lesser part of the problems and thereby proximately influences the final result. In other words, the rule that chance must be the <u>dominant</u> factor is to be taken in a qualitative or causative sense rather than a quantitative sense. This was directly decided in Coles v. Odhams Press, Ltd., supra, when it was held the question was not to be determined on the basis of the mere proportions of skill and chance entering in the contest as a whole.

" . . . In the instant case it stands conceded that at the beginning of the 'Famous Names' contest the cartoons were comparatively simple and the list of suggested titles

was short. This made the contest inviting
to entrants. But towards the end the car-
toons became more 'subtle' and as many as
180 titles had to be considered. It was a
weeding out process, undoubtedly; and, if
chance inhered in the solution of these lat-
ter cartoons, though only a few of them, and
eliminated a large number of contestants,
then it must be said the result was influenc-
ed by chance.

"Further, we are convinced the question
whether the element of chance was present
must be viewed from the standpoint of the
nearly 70,000 persons who entered the con-
test in response to the advertising thereof;
and that it is not to be measured by any ab-
solute or technical standards. As was said
in Coles v. Odhams Press, Ltd., supra, 'the
competitor is the person to be considered'.
In the instant case the public was informed
that any one might win; that no special skill,
training or education was required; and that
an opportunity was offered to gain some 'easy
money'. It is true reference to the possibil-
ity of children's winning was omitted from the
later advertising, but aside from that hope
was held out to the general public. That be-
ing true, whether chance or skill was the de-
termining factor in the contest must depend
upon the capacity of the general public--not
experts--to solve the problems presented.

"The respondent's theory is that the in-
terpretation of rebus puzzles is a science;
and that, since they can be solved by the ap-
plication of these scientific principles, the
element of chance is absent. Some of the deci-
sions lend support to that view, such as Hudel-
son v. State, supra, Stevens v. Times-Star Co.,
supra, and Waite v. Press Publishing Ass'n.,
supra. All of these cases conceded an expert
might more nearly than a nonexpert approach a
solution of the problems they were considering,
and then swept away that concession by saying
that nevertheless there remained unfathomable
elements in the problem which nobody could
solve. This might be taken to mean that, if

contest problems can be solved at all, chance is eliminated. And the 'advertoshare' checker game cases seem to partake of that theory, though there is possibly an allowable distinction there.

"But such is not the true general rule. As was said in People ex rel. Ellison v. Lavin, supra, if a contest were solely between experts, possibly elements affecting the result which no one could foresee might be held dependent upon judgment; but not so when the contest is unrestricted. What is a matter of chance for one man may not be for another. And as Mr. Justice Holmes said in Dillingham v. McLaughlin, 264 U. S. 370, 373, 44 S. Ct. 362, 363, 68 L. Ed. 742, 'what a man does not know and cannot find out is chance as to him, and is recognized as chance by the law.' Obviously, if some abstruse problem comparable to the Einstein theory were submitted to the general public in a prize contest on the representation that no special training or education would be required to solve it, the contention could not be made, after contestants had been induced to part with their entrance money, that the element of chance was absent because there were a few persons in the world who possessed the learning necessary to understand it." (Emphasis supplied)

From the authorities cited, it is apparent that the manner in which the questions are presented and the nature of such questions will control as fact issues in each contest as to whether the contest or any controlling portion of it is reduced to mere guess or chance. It is impossible for us to say that in all contests under the "Bank of Knowledge" plan mere chance and guess will be dominant and therefore illegal, or that skill and knowledge will be dominant and therefore legal.

The particular questions submitted with your request as the ones to be used in the first performance appear to present a contest based primarily upon skill and knowledge rather than upon chance. If all the contests or performances are based upon similar questions and are conducted in a manner so that skill and knowledge control rather than mere guesses, these contests or performances would be lawful.

On the other hand, it is entirely possible for "Bank of Knowledge" questions to be so worded that one or more of them rest wholly upon pure guesses in so far as practically all of the participants are concerned. In such case the scheme may fall within the class condemned by such cases as Stevens v. Times-Star Co., 73 N. E. 1058, wherein the contest involved an estimate of the number of votes to be cast for Secretary of State of Ohio in a particular election; People v. Lavin, 71 N. E. 753, wherein the contest involved an estimate of the amount of tax to be paid the United States Government upon cigars; or White v. Press Publishing Association, 155 F. 58, another contest involving an estimate of the votes to be cast in a presidential election.

The letter opinion on this subject by Frank J. Delaney, Solicitor of the Post Office Department, February 6, 1948, recognizes that the circumstances of each separate contest or performance are controlling. After outlining the procedure to be followed in the first performance, the Solicitor says:

"When conducted in accordance with the above outline, and employing questions of such a nature as not to require the contestants to guess at their correct answers, matter relating to this plan would appear to be acceptable for mailing insofar as Section 601, Postal Laws and Regulations of 1940, is concerned."

Obviously, we cannot anticipate the type of questions which will be used in subsequent programs. Therefore, we cannot categorically state that the "Bank of Knowledge" plan is as a matter of law a lottery or not a lottery. The question of whether chance predominates over skill cannot be determined abstractly, but depends on the circumstances of each separate contest operated under the plan. The plan can be operated so as not to violate the law. Likewise, it can be operated in such a manner as to be unlawful. Each contest thereunder will present a separate fact situation which cannot be prejudged as a matter of law.

## SUMMARY

Whether the theater question contest plan known as "Bank of Knowledge" is a lottery and violates Art. 654, V. P. C., is

a question to be determined upon the facts and circumstances of each contest and cannot be determined abstractly as a matter of law. If conduct of the contest and the answers to a given set of questions are dependent primarily upon skill and knowledge rather than upon mere chance, the contest is lawful. On the other hand, if any controlling portion of a contest calls for and is dependent upon pure guesses or chance, it is a lottery and is therefore unlawful.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

Ned McDaniel
Assistant

APPROVED:

ATTORNEY GENERAL.

NMc:jmc
Encls.